**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Hon. Sara L. Ellis |
| v. | ) | |
| | ) | No. 22 CR 268-1 |
| JERRY P. WATSON, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT JERRY WATSON'S SENTENCING**
**MEMORANDUM AND RESPONSE TO PSI REPORT**

Jerry Watson, now 73 years old, has long served as a positive force in his community. While helping raise his three children, Mr. Watson spent over 34 years starting, building, and running a flooring business in the Chicago area, Commercial Carpet Consultants, Inc. ("CCC"). Using skills and knowledge honed while attending trade school and working as a journeyman installer, Mr. Watson founded and grew CCC, while supporting his family and literally dozens of others as well. Over those years, Mr. Watson established himself as a reliable leader, beloved family member, and dependable friend.

Mr. Watson stepped away from his life's work in 2016. Rather than enjoy a well-earned retirement, Mr. Watson has suffered a series of significant health problems, including hypertension, lung tumors, diabetes, neuropathy, and end stage renal failure, which has necessitated peritoneal dialysis with escalating frequency. Since 2020, Mr. Watson has been required to undergo thrice-weekly renal dialysis sessions, treatment

needed to sustain his life. Notwithstanding excellent medical care, Mr. Watson's combined health issues have reduced his life expectancy to approximately two years.

In the face of these daunting problems, Mr. Watson has remained an honorable, responsible, and positive man. Mr. Watson acknowledges his role in the criminal conduct at issue and freely admits his responsibility and guilt. However, as reflected in many of the attached character letters, those who know Mr. Watson the best place in context Mr. Watson's lapse in judgment and missteps. These individuals attest to Mr. Watson's strong character, good reputation, and positive societal contributions over many years.

So too, the undersigned is compelled to place in its fair context Mr. Watson's (and CCC's) antitrust violation of soliciting and providing "complimentary bids." In sum, the offense conduct did not inflate end user prices because the practice was *ad hoc*, infrequent, and never pre-arranged. Moreover, unlike prototypical bid-rigging, Mr. Watson and CCC never offered or accepted bribes, never offered kickbacks, never suppressed competitor's bids, and never allocated or segregated markets among competitors. Mr. Watson engaged in the illegal conduct for reasons wholly unrelated to price manipulation, market allocation, or other improper illegal purposes.

While Mr. Watson does not dispute Probation's recommended Guideline calculation, the undersigned counsel respectfully submit that it overstates the seriousness of Mr. Watson's offense. Indeed, the sentencing factors of 18 U.S.C. §3553 support a non-custodial sentence and reasonable fine, which would be in addition to the $1.2 million fine previously ordered against CCC – a punishment that this Court acknowledged was very significant. As required by federal law, Mr. Watson seeks a sentence that is

"sufficient, but not greater than necessary" to comply with federal sentencing law. In light of all the circumstances, Mr. Watson respectfully requests a non-custodial sentence: (i) of probation or home confinement, and, (ii) a reasonable fine not to exceed $40,000.

**LEGAL FRAMEWORK**

As this Court well knows, the Court in *United States v. Booker* restored district courts' discretionary ability to fashion a sentence tailored to the individual circumstances of both the case and the defendant. *U.S. v. Ranum*, 353 F. Supp. 2d 984 (E.D. Wis. 2005) (courts must "consider all of the applicable factors . . . and sentence the person before it as an individual"). As such, district courts are no longer bound by the sentencing guideline range. *Booker*, 125 S. Ct. at 764-65; *U.S. v. Dean*, 414 F.3d 725, 729 (7th Cir. 2005); *U.S. v. Robinson*, 435 F.3d 699, 701 (7th Cir. 2006).

Indeed, district courts can no longer presume that a sentence within the guidelines range is the correct sentence. *Gall v. United States*, 552 U.S. 38, 50 (2007) (the court "may *not* presume that the Guidelines range is reasonable") (emphasis added). And there is no requirement of "extraordinary" circumstances to justify a sentence outside the Guidelines range. *Id.* at 47.

Rather, *Booker* instructs district courts to give the sentencing guidelines no more or less weight than any other applicable sentencing factor. *U.S. v. Jaber*, 362 F. Supp. 2d 365, 370-76 (D. Mass. 2005) (providing comprehensive analysis of why sentencing guidelines do not reflect statutory purposes of punishment); *Ranum*, 353 F. Supp. at 987 (same). This Court is now required to "consider all of the applicable factors . . . and sentence the person before it as an individual." *Ranum*, 353 F. Supp. 2d at 984.

While considering all of the sentencing factors set out by 18 U.S.C. § 3553(a), the court must ***only impose a minimally-sufficient*** sentence. 18 U.S.C. §3553(a) & (a)(2) ("The court shall impose a sentence sufficient, ***but not greater than necessary***, to comply with the purposes set forth" in 18 U.S.C. §3553(a)(2)") (emphasis added). A "minimally-sufficient" sentence is one that achieves the statutory purposes of justice – namely, ***punishment, general deterrence, individual deterrence, and rehabilitation***.

The "parsimony provision" found in Section 3553 is not simply a "factor" to be considered. Rather, the "parsimony provision" ***represents a cap*** above which the district court is statutorily prohibited from sentencing – even when a greater sentence is recommended by the sentencing guidelines. *U.S. v. Denardi*, 892 F.2d 269, 276-77 (3d Cir. 1989) (Becker, J., concurring in part and dissenting in part) (emphasis added). Not only must this Court refrain from presuming that a sentence within the guidelines range is correct, *Rita*, 127 S. Ct. at 2465, but it is compelled to impose a sentence below that range if it would be sufficient to achieve the statutory purposes of punishment, deterrence generally, individual deterrence, and rehabilitation. 18 U.S.C. §3553(a) & (a)(2).

## DISCUSSION

### A. §3553(a)(1) Sentencing Factor: "The History and Characteristics" of Mr. Watson

In formulating a sentence that is "sufficient but not greater than necessary" for the particular defendant and offense presented, a court must examine, *inter alia*, the defendant's "history and characteristics." 18 U.S.C. §3553(a)(1). Here, Mr. Watson's history and characteristics strongly support the proposed non-custodial sentence and fine.

**1. Mr. Watson's Deteriorating Health and Reduced Life Expectancy.**

Mr. Watson's advanced age, serious medical conditions, and reduced life expectancy support the requested non-custodial sentence and fine. Mr. Watson recently celebrated his 73rd birthday. Unfortunately, he suffers from a series of significant medical issues that have significantly reduced his life expectancy and render incarceration risky, ill-suited, and disproportionately punitive. Mr. Watson requires critically important medication, monitoring, and treatment which are challenging even outside the restrictions imposed by prison.

Mr. Watson was diagnosed with Type II diabetes in approximately 2000, which he treats with a daily injection of Victoza, a non-insulin medication used to reduce blood sugar. Mr. Watson's medical condition became more complicated in 2009 when medical providers diagnosed him with renal cancer and removed one of his kidneys. However, since then, Mr. Watson has suffered a progression of medical complications and worsening conditions, including:

- Congestive heart failure diagnosed in February 2020;
- Multiple lung nodules identified in May 2021 x-rays. Though biopsies to date have not shown these masses to be malignant, his doctors have advised close monitoring given his history of cancer. Mr. Watson has experienced increased shortness of breath and tightness in his chest and has begun seeing a pulmonologist regularly as a result;
- Peripheral neuropathy, which is weakness and pain in the hands and feet as a result of his worsening diabetes;
- A bowel obstruction that required surgical intervention in 2018; and
- Left hip replacement surgery in April 2022.

Mr. Watson's most serious condition, however, is chronic kidney disease and now end-stage renal failure. As a result, Mr. Watson cannot live without thrice-weekly dialysis. *See*, Fresnius Medical Care Statement of Medical Necessity, attached as Ex. 1. Dialysis can be demanding and often leaves Mr. Watson exhausted. It can also lead to symptoms such as unsafe changes in blood pressures, dizziness, cramping nausea, vomiting, and general discomfort, even on those days he does not receive treatment. *Id.* But, without this required dialysis three times per week, Mr. Watson will not survive.

Regrettably, there is no prospect for improvement of Mr. Watson's kidney disease. His sole remaining kidney is shutting down and nothing can reverse the disease's progression. The only means for treating the condition are a transplant or continued dialysis, and Mr. Watson's congestive heart failure and other medical conditions disqualify him as a transplant candidate.

Mr. Watson's poor health and medical conditions have taken a severe toll on him. Over the last eight years or so, Mr. Watson has lost nearly 100 pounds. He now weighs approximately 140 pounds whereas in 2013, he weighed 239 pounds. Mr. Watson's congestive renal failure, heart deficiencies, lung tumors, and other medical conditions prevent Mr. Watson from participating in normal life activities.

A typical 73-year-old American male has a life expectancy of roughly 13 years. A person Mr. Watson's age undergoing dialysis, however, has a life expectancy of only about 4 years from the outset of the treatment. *United States Renal Data System 2021 Report: End Stage Renal Disease, Chap. 6 Mortality, Table 6.1*, attached as Ex. 2 (at p. 13). Mr. Watson

began dialysis treatments in 2020, leaving only about two years remaining on his expected life span.

As a result, Mr. Watson and his family have focused their efforts on maximizing the time they can share with each other. As his daughter states, "My kids as well as my niece and nephew need this time with him since we don't know how much time is left. I hope my kids are able to get the precious time that is left with him so they have the same memories that we were able to share with him our whole lives."

### 2. Mr. Watson's Acceptance of Responsibility, Character, Reputation, and Positive Contributions to Society.

Mr. Watson's personal history reveals that his antitrust misconduct is completely out of character. Mr. Watson has no meaningful criminal history, no history of gambling, no history of domestic violence, no history of drug abuse, and never has been a gang member. Mr. Watson also is deeply remorseful for his role in the offense and deeply regrets his misstep and lapse in judgment. Mr. Watson timely accepted responsibility for his (and CCC's) conduct, pursuant to an Information, Waiver of Indictment, and Plea Agreement. Moreover, although no longer with the company, Mr. Watson strongly advocated for CCC to waive indictment, agree to an information, plead guilty and pay a significant criminal fine.

Mr. Watson understands how his mistakes have needlessly saddled his family's company with significant economic burdens and, he worries, tarnished his memory, his company, and his family's name. Mr. Watson worries that he has wasted decades of effort trying to build CCC's business through his own reputation founded on honesty and hard

work and is deeply saddened that at the end of his career (and life), he is now known as a convicted felon.

The character letters[1] supplied by those who know Mr. Watson best attest to his acceptance of responsibility, remorse, general good character, and positive societal contributions. These letters reveal how entirely out of character it was for Mr. Watson to engage in the antitrust misconduct and how deeply remorseful he is. And they show that to those he loves Mr. Watson's mistakes cannot erase all the good he has done. As his son, Jeremy states, "despite the hell of these last 5 years, to me his name is not tainted at all."

A recurring theme among those who know him best is Mr. Watson's reliability and dependability; family, colleagues, and friends all know that they can count on him. Mr. Watson is the loving father of three adult children and grandfather to four. He is also the admired uncle in a close-knit family who have historically relied on, depended upon, and benefited over the decades from Mr. Watson's strong and generous character.

Even at a young age, Mr. Watson displayed his concern for others. When Mr. Watson was only twenty-one years old, his father unexpectedly died of a heart attack. As his sister Sue recounts, even at that young age, Mr. Watson showed the maturity and responsibility that characterized much of his life. According to Sue, Mr. Watson "was newly married, but kept in constant touch with our mom to be sure that she and I had everything we needed. His own grief was overwhelming, as he was extremely close to

[1] Letters from Mr. Watson's friends and family are attached to this memorandum as Exhibit 3, and pertinent quotations from them are included in this section.

our dad, but his support for us took precedence." Looking out for others was a trait that revealed itself time and again throughout Mr. Watson's life.

Similarly, in approximately 2014, Mr. Watson began a relationship with Sue Cline, with whom he has shared a home for the last four years. Ms. Cline describes Mr. Watson as "my rock, someone who is always there for me when times get tough." Like many others, she has been able to depend on Mr. Watson through the years for love, support, and guidance. Approximately two years ago, Mr. Watson and Ms. Cline took in her adult son who was struggling with alcohol dependency. Mr. Watson opened their home to her son and his dog who lived with Jerry and Sue for about a year and one-half, until he could get back on his feet. In the words of Ms. Cline, "Not all of it went easy but Jerry stuck by me and supported my son anyway he could. Not many men I know would totally change his lifestyle to that extreme to help someone. My son and I will forever be grateful."

Mr. Watson's strong character traits were forged while growing up in a working-class family in Chicago. His father installed carpets, and his mother was a homemaker. Mr. Watson is one of two children; his sister Suzanne is about one year older, and they remain close to this day. In 1967, Mr. Watson graduated from Kelvyn Park High School., then attended Washburn Trade School where he learned to install flooring, as his father did before him. Shortly after earning his journeyman's degree, Mr. Watson married Brenda Starzynski, and they had three children: a daughter (Kimberly) and two sons (Jeremy and Jason).

In 2003, Mr. Watson and Ms. Starzynski separated and then divorced after thirty years together. Still, the two maintained a positive relationship, with Ms. Starzynski

continuing to work part-time at CCC to this day. According to Donna Lorenz, CCC's Controller, Mr. Watson supported Ms. Starzynski, including when her mother passed away. Mr. Watson's son, Jason, describes how, as Mr. Watson's former mother-in-law was dying from lung cancer, Mr. Watson spent hours every day helping nurse her and keep her comfortable. When Jason asked his father why he made such an effort for someone he was no longer related to, his telling response was "that's just what you do." Moreover, Mr. Watson's daughter explains, "[T]hough my parents have been divorced for years . . . the bond is still strong with my mom's side of the family," reflecting Mr. Watson's strong sense of loyalty.

Mr. Watson's positive character traits are well known to those who worked with and for him. Through hard work, integrity, and commitment, Mr. Watson founded and grew a successful flooring business, known as CCC. By the time he retired in June 2016, CCC employed dozens of full-time personnel and provided work for dozens more union installers. Over the years, Mr. Watson exhibited leadership and integrity. As one CCC sales representative recounted, "Mr. Watson's reputation as a businessman and as a person is second to none."

Mr. Watson's leadership focused on others more than himself. As he taught his son, Jeremy, "Give to your clients more than you take and, in the end, you will receive more than you give." But his generosity was not just focused on his clients. Mr. Watson gave to his employees and team. In turn, he was rewarded with their loyalty and respect. One CCC employee commented that Mr. Watson "is the kind of man that would literally give you the shirt off his back." Alyssa Iymperopoulou, a CCC Senior Project Accountant,

recounted that when the wife of one of the company's estimators was diagnosed with cancer, Mr. Watson insisted that he take off any time he needed to help care for his wife and young child and receive his full salary regardless.

Mr. Watson used CCC to help support many, particularly those close to him. Jason Watson explains how his father used the business he built to provide opportunities for his former wife's family. According to Jason, "As the business grew, my dad never stopped looking for opportunities to help my mom's family. Both of my aunts got jobs in accounting and secretarial positions. With my mom working from home, all seven of her family members were then employed by my dad. He was literally running a family business with someone else's family." Mr. Watson's sister noted, "He has employed countless family members and friends, giving them opportunities to learn and grow professionally. He has mentored his sons as they, too, have grown into successful businessmen."

His sons have learned the business from their father and took over CCC upon his retirement, but not until after they learned the business from the bottom up and Mr. Watson was confident they were ready and the business would be in good hands. Ms. Lymperopoulos observed, "That showed me how much Jerry really did care not only about himself or his family, but he also cared about everyone that worked for him." His nephew, Matthew Broadhead, who serves as CCC's Operations Manager has had the opportunity to observe Mr. Watson's leadership and states, "I know I can speak for others when I say that Jerry was seen as not only the owner of the company or the boss, but also as a friend. He is a person that you can go to with a problem and he will help in any way

he can. He has attended weddings and birthday parties of employees, loaned money when the situation called for it, and has generally just always been available and approachable."

Sue Cline attests that Mr. Watson "worked hard to maintain good business relationships, and he cared deeply about all his employees from the top people on his sales team to the men who worked in the warehouse. He always was concerned that his actions could affect not only his employees but their families as well. He never took that lightly." Indeed, Mr. Watson's remorse for his crimes stems not only from the impact it has had on him personally, but also the burden it imposed on CCC and everyone associated with it. His daughter Kimberly noted, "The fines that the company are facing are a huge hit on his legacy that he has left behind. I know that he took the blame for the company because he knew he was wrong and knew that everyone else acted by his example."

The financial burden imposed by CCC's fine in this matter and the obstacles it imposed towards the company's continued success weigh on him heavily. According to Ms. Cline, "I know if Jerry had the chance to do things differently, he would jump at it. He regrets how his error in judgement has affected our lives and his family's."

Even with the legal problems he has faced over the past few years, Mr. Watson has found time to lend support to others. In November 2020, his brother-in-law tragically died of COVID, and Mr. Watson was there to support his sister and her family in their loss. His sister observed, "Jerry wanted so badly to be with me and lend his support but could not physically be here for me due to his own health and risk factors. He called me

every single day for at least six months to check on me and see if there was anything at all that he could do for me. His support meant so much to me and to my children."

In sum, Mr. Watson has lived his life giving to others and that life cannot be defined by his greatest mistake. The good he has done, combined with his advanced age (73 years old), serious medical conditions that require frequent and important treatment and monitoring, reduced life expectancy, acceptance of responsibility, remorse, and strong character all weigh in favor of a non-custodial sentence and fine.

**B. <u>§3553(a)(2) Sentencing Factor: Adequate Deterrence and Just Punishment</u>**

The requested non-custodial sentence and fine also satisfy the §3553(a)(2) sentencing factors of specific deterrence, general deterrence, and just punishment. 18 U.S.C. §3553(a)(2).

As for specific deterrence, Mr. Watson is obviously not a risk for recidivism. First, he is retired and not in a position to engage in the type of misconduct at issue here. More importantly, Mr. Watson's advanced age, poor health, and long life free of any serious criminal history demonstrate that the risk of any future criminal conduct is nonexistent. Accordingly, the sentencing objectives of protecting the public from, and/or deterring, Mr. Watson from further crime are satisfied.

Considerations of general deterrence and just punishment are similarly satisfied here. The proposed noncustodial sentence and personal fine (particularly, when considered in the context of the $1.2 million corporate fine already imposed on CCC) adequately promote the sentencing objectives of general deterrence and just punishment. Probation itself is a restriction on an individual's freedom and comes with significant

potential consequences should one fail to comply in all respects with the terms and conditions of that sentence. While custodial sentences are qualitatively more severe than probationary sentences of equivalent terms, offenders on probation are nonetheless subject to conditions that meaningfully restrict their liberty. *U.S. v. Knights*, 534 U.S. 112, 119 (2001) (probationers do not enjoy the absolute liberty to which every citizen is entitled). For example, probationers may not unconditionally leave the judicial district, move, travel, or change jobs. *Id.* They must report regularly to their respective probation officers, permit unannounced visits to their homes, and refrain from associating with any person convicted of a felony. U.S.S.G. §5B1.3. Individuals serving probation in Illinois are not allowed to vote and will forfeit their Second Amendment rights. Furthermore, most probationers also are subject to individual "special conditions" imposed by the court. Finally, a probationer always faces the possibility of harsh consequences should he violate a condition of his probation. *See* Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957) (probation is not merely letting an offender off easily). Accordingly, the proposed non-custodial sentence of probation or home confinement in the waning days of Mr. Watson's life and significant personal fine (particularly, when considered in the context of a $1.2 million corporate fine) support the federal sentencing factors of general deterrence and just punishment. *See United States v. Warner*, 792 F.3d 847, 860 (7th Cir. 2015) (probationary sentence sufficient in case involving $5.6 million tax fraud).

**C. <u>§3553(a)(1) Sentencing Factor: The Nature and Circumstances of the Offense</u>.**

In formulating a sentence that is "sufficient but not greater than necessary" for the particular circumstances presented, a court must also examine, *inter alia*, the "nature and circumstances" of the offense. 18 U.S.C. §3553(a)(1). As explained below, the nature and circumstances of Mr. Watson's offense, when fairly and fully understood, support the proposed non-custodial sentence and fine.[2]

**1. <u>Circumstances of the Offense: Mitigating Factor of No Bribes, Kickbacks, or Market Allocation</u>.**

Mr. Watson (and CCC) pled guilty to engaging a "bid rigging" through a scheme involving the solicitation and submission of "complimentary bids." Complimentary bidding is a legal term of art generally used to refer to bids that give the appearance of a genuine bid but are submitted in a manner indicating they were not intended to not secure acceptance. And while bid rigging is a serious offense, which Mr. Watson acknowledges and accepts responsibility for, an examination of the particular circumstances of his conduct reveals that some of the concerns typically implicated in such cases are not evident here.

Before addressing some of the particular details of Mr. Watson's offense, it is important to explain what he did not do. First, unlike many "bid rigging" criminal cases, there is no evidence here of any "bid rotation," in which the bid rigging participants (here, the subcontractors) agree in advance to alternate winning bidders ("you get one, I get the

[2] In addition to the following analysis, Mr. Watson incorporates herein by reference his Defendant's Version of the Offense, previously submitted to Probation.

next one"). Second, there is no evidence here of "bid suppression," which occurs when bid riggers succeed in preventing outside subcontractors from bidding (*e.g.*, by paying them off or through threats). Third, Mr. Watson also did not engage in any "market division" or "market allocation." "Market division" occurs when bid riggers agree to divide markets by agreeing not to compete in each other's market segment or territory or do so only through collusive measures like bid rigging. Fourth, Mr. Watson never paid any bribe, kickback, or other illegal remuneration when requesting or submitting a complimentary bid. Fifth, Mr. Watson never collusively inflated CCC's prices before, or in the context of, requesting a complimentary bid from another subcontractor.

**2. <u>Circumstances of the Offense: Mitigating Factor of Competitive CCC Pricing</u>.**

One important mitigating circumstance of the offense is that Mr. Watson (and CCC) did not inflate prices as a result of any bid rigging. According to the government, between January 2011 and June 2017 Mr. Watson (and CCC) secured twelve flooring jobs for which they solicited a complimentary bid from another flooring contractor. However, Mr. Watson and CCC submitted these twelve (and all other) bids "blind." Meaning, at the time Mr. Watson (and CCC) submitted these twelve bids to a general contractor for review: (1) Mr. Watson (and CCC) did not know how many other flooring subcontracts the general contractor invited to bid on the project, (2) Mr. Watson (and CCC) did not know how many other flooring subcontractors actually submitted a bid on the project, and (3) Mr. Watson (and CCC) did not know if the general contractor would request CCC to find a complimentary bidder for the particular job. To be clear, for these twelve jobs

Mr. Watson (and CCC) *never had any pre-arranged agreement* (*i.e.*, prior to CCC bidding) with any general contractor or competitor that "bid rigging" would be involved. As a result, CCC had every incentive to, and did prepare legitimate, competitive bids for each of the jobs it won and for which it solicited complimentary bids.

In sum, although the evidence does show that Mr. Watson (and CCC) corrupted the competitive ***process*** by seeking and/or submitting collusive bids at the request of general contractors, which made it look like there was more competition for the work than there was, there is no evidence that this conduct resulted in either the general contractors or their customers paying higher prices for the flooring products and services provided by Mr. Watson and CCC.

The sophisticated nature of the commercial parties involved ensured that CCC's pricing was competitive and market based, even in the rare circumstances where Mr. Watson (and CCC) were asked to obtain a complementary bid. The clients of Mr. Watson (and CCC) were sophisticated and experienced general contractors. Evidence shows that these general contractors compared the pricing offered in subcontractors' bids against their own databases for historical pricing so they would recognize if a bid was unreasonable when compared to market conditions. Moreover, subcontractors like Mr. Watson (and CCC) treaded very carefully with general contractors because any suspected price inflation would undermine and jeopardize the subcontractor's relationship with the general contractors, which was the lifeblood of these subcontractors' business.

Similarly, many end users on the projects that CCC bid and worked on were sophisticated in construction management. One example was Equinix, which operates

digital data centers and is experienced in building and refurbishing such facilities throughout the country. Equinix representatives informed the government that its personnel maintained their own records and were able to compare bids received to the prices they previously paid on comparable jobs. As a result, Equinix could tell if a bid was unreasonably inflated.

Lastly, on the competitive pricing issue, there is evidence that in some of the cases where a general contractor asked Mr. Watson (and CCC) to obtain an after-the-fact complimentary bid, at least one flooring subcontractor in addition to CCC submitted a competitive bid.

Accordingly, based on all of the foregoing, one important mitigating circumstance is that CCC offered competitive pricing even on the twelve jobs it won but also solicited a complimentary bid.

**3. Circumstances of the Offense: Mitigating Factor of Being an Infrequent, *Ad Hoc* Occurrence.**

Another mitigating circumstance is the *ad hoc*, infrequent nature of the bid rigging practice to which Mr. Watson pled guilty. The government has identified twelve flooring jobs spread over a six-and-one-half year period that Mr. Watson (and CCC) secured after a general contractor asked for a complimentary bid. This averages out to less than 2 won projects per year. Even considering the jobs in which Mr. Watson (and CCC) provided (rather than solicited) a complimentary bid over this same period, the practice involved no more than a handful of complimentary bids per year. Again, the point is not to minimize the practice but to provide fair context. Throughout these six and one-half

years, CCC submitted over one thousand bids per year, winning hundreds of jobs each year, without any complementary bid.

The *ad hoc* nature of the practice too is noteworthy. Mr. Watson (and CCC) never knew in advance if, or when, a general contractor or other flooring subcontractor (typically, Mr. David's) would ask for a complimentary bid. Based on the government's discovery, it appears that a general contractor would ask Mr. Watson (and CCC) to obtain a complimentary bid only after the general contractor failed to secure three flooring bids by the bid deadline. On these rare and occasions, rather than delay the project and reopen the bidding process (which already once failed to secure three willing subcontractor bids), the general contractor would ask Mr. Watson (and CCC) to secure a complementary bid for the general contractor. Significantly, Mr. Watson (and CCC) never did so pursuant to some pre-arranged agreement (with other subcontractors or the general contractor) to obtain a competitive advantage. Rather, Mr. Watson (and CCC) sought a complementary bid only when the general contractor made its after-the-fact request because of these circumstances.

The government's discovery demonstrates why, on occasion, a general contractor might be able to only secure only two competitive bids for a particular project and go looking for a complementary bid. For instance, in 2016, a general contractor sent a blind email to flooring subcontractors to submit a bid for a flooring job at IMC Financial. The subcontractor's deadline to submit the flooring bid was December 16, 2016. According to internal emails, Mr. David's, another flooring subcontractor, did not want to bid for the job for several reasons, including: (1) the project was considered "low margin," (2) there

were higher priority year-end projects, (3) there was insufficient time to work up the IMC Financial bid "safely," and (4) Mr. David's believed that CCC was likely to win the job. On the other hand, Mr. David's (like all flooring subcontractors) did not want to alienate a general contractor, and Mr. David's management worried that ignoring the general contractor's invitation to bid was sending the "wrong statement" to the general contractor. As a result, Mr. David's decided to contact CCC, get CCC's proposed pricing, and "utilize our time more wisely." CCC accommodated Mr. David's by providing Mr. David's with CCC's bid breakdown and numbers, which Mr. David's then used to submit a slightly higher bid. Accordingly, for this job: (1) CCC submitted its best, competitive price, (2) before doing so, CCC had no prior knowledge that a comp bid would be submitted by any subcontractor, (3) to this day, CCC does not know how many competitive bids were submitted to the general contractor besides CCC's competitive bid but presumably there were other competitive bids submitted, (4) Mr. David's had no interest in expending the time or resources to "compete" for this job, (5) rather, Mr. David's solicited and submitted a "comp bid" only to keep the general contractor "happy" and not for any anti-competitive purposes.

According to the government's discovery, another circumstance explains why a general contractor would, on the rare occasion, request Mr. Watson (and CCC) to find a complementary bidder. CCC's Motorola job (the largest job at issue in this criminal case) is an example. On larger, more complex jobs, general contractors might request a flooring subcontractor(s) to assist with pre-construction planning, scoping, and budgeting. Although these flooring contractor(s) spent significant time doing so for free, this pre-

construction work provided those subcontractors an advantage for later securing the job based on the parties' relationship and the subcontractor's familiarity with the work. As a result, on jobs where subcontractors provided pre-construction planning services, other subcontractors typically refused to bid these jobs, figuring that the time and expense to do so was a likely wasted effort.

This phenomenon apparently occurred here with CCC's $1.38 million Motorola job. For this larger, complex Motorola job, the general contractor asked CCC and another flooring subcontractor to provide significant pre-construction services (for free). When the time came to bid the project's four floors, CCC competitively and blindly bid the project, not knowing the pricing that would be submitted by the other flooring subcontractor that also provided pre-construction services and any other flooring subcontractor blindly invited to bid. Because the general contractor apparently could secure only two (not three) flooring bids, the general contractor asked Mr. Watson (and CCC) to obtain a complementary bid, which Mr. David's agreed to provide at CCC's request. After doing so, the general contractor split the job between CCC and the other flooring subcontractor who provided pre-construction services.

**4. Circumstances of the Offense: Mitigating Factor Regarding its Origin & Motivating Reason.**

The final mitigating circumstance that counsel respectfully asks the Court to consider in fashioning a sufficient by not greater than necessary sentence is the origination and motivation behind the complimentary bidding practice. According to the government's discovery, the complimentary bid practice originated when Michael

Gannon (a sales representative for Mr. David's Flooring) asked Mr. Watson for a complimentary bid. Mr. Gannon and Mr. Watson were good friends, and Mr. Watson wrongly agreed to provide the requested bid out of friendship, not for any nefarious, financial or other improper purpose.

Thereafter, on rare occasions, when a general contractor asked Mr. Watson (and CCC) for a complimentary bid, Mr. Watson obtained one by asking Mr. Gannon. Again, Mr. Watson was wrong to do so and does not seek to minimize his misconduct. However, he was motivated by a desire to maintain CCC's relationships with its customers, the general contractors, not to inflate prices, restrict competition, or carve up the market. [3]

**D. <u>The Recommended Sentencing Guideline Range Overstates the Seriousness of this Offense</u>.**

In addition to the factors set out in § 3553, this Curt must consider the recommended Sentencing Guideline calculation. Mr. Watson does not dispute the recommended Guideline calculation of 18-24 months based on a total offense level of 15 and Criminal History Category of I (based on Mr. Watson's criminal history score of 0). However, for all the reasons articulated above, the undersigned counsel respectfully submit that the recommended Guideline range overstates the seriousness of the offense. Mr. Watson does not otherwise object to the contents of Probation's Presentence Investigation Report.

---

[3] To the extent that the government seeks to compare Mr. Watson's misconduct with those of any other defendant, including Michael Gannon, such comparison is misplaced. *See* 18 U.S.C. 3553(a)(6) (the "need to avoid unwarranted sentencing disparities" among defendants found guilty of "similar conduct"). These other individual defendants – none of whom, to Mr. Watson's knowledge, suffer the same medical ailments as Mr. Watson – all engaged in qualitatively dissimilar and more serious antitrust misconduct, including a bid rotation scheme involving kickbacks, bribes, and large public school contracts, which are inapplicable to Mr. Watson (and CCC). *E.g.*, *U.S v. Carter Brett*, 2020 CR 00080, Dkt. #1 (Information), #10 (Plea).

**E. <u>An Appropriate Fine</u>.**

The Guideline calculation for this offense yields a fine range between $39,648.48 and $198,492.40. PSI ¶95. Pursuant to §5E1.2(d), the factors to consider in determining the amount of the fine include a myriad of factors, including: (1) the need for the combined sentence to reflect the seriousness of the offense to promote respect for the law, to provide just punishment and to afford adequate deterrence; (2) evidence presented as to defendant's ability to pay the fine in light of his earning capacity and financial resources; (3) the burden that the fine places on the defendant and his dependents relative to alternative punishments; (4) any restitution or reparation that the defendant has made or is obligated to make; (5) any collateral consequences of conviction, including civil obligations arising from defendant's conduct; (6) whether the defendant previously has been fined for a similar offense; (7) the expected costs to the government of any term of imprisonment, probation, and/or supervised release; and (8) any other pertinent equitable considerations. Courts are authorized to waive the imposition of a criminal fine, which Mr. Watson is not requesting. U.S.S.G. §5E1.2(a) & §5E1.2(e).

Based on the foregoing analysis, including but not limited to the requested waiver of interest on any ordered criminal fine and/or restitution, Defendant requests that the Court enter an order imposing a fine of no more than $40,000. As noted above and described in the Presentence Investigation Report, Mr. Watson is retired and lives on a fixed income. Though he has worked hard and accumulated a reasonable amount to support himself in retirement, that amount is relatively modest and a deduction of $40,000 would reflect a meaningful reduction in his available resources. In addition, the

$1.2 million fine this Court previously imposed on CCC largely accounts for conduct undertaken or directed by Mr. Watson.

## CONCLUSION

Mr. Watson deeply regrets his involvement in the offense conduct. It has, among other adverse consequences, imposed burdens on his sons that may endanger their ability to carry on his life's work and provide meaningful employment and support for so many people who mean so much to him. And above all, it has cast a shadow over Mr. Watson's final days. Given his complex medical problems, Mr. Watson faces the prospect that he will not survive more than two years further. His involvement in any criminal conduct is a severe aberration and imposing a period of incarceration in light of all these circumstances would be a punishment greater than necessary to achieve the legitimate goals of sentencing. Mr. Watson therefore respectfully requests that this Court: (1) sentence him to a term of probation or home confinement, adopting the conditions proposed in the Presentence Investigation Report; and (2) enter a criminal fine not to exceed $40,000.

Respectfully Submitted,

JERRY WATSON, Defendant

By: */s/ James P. Fieweger*
Counsel for Jerry Watson, Defendant

Michael Best & Friedrich LLP
444 W. Lake Street, Suite 3200
Chicago, Illinois 60606
T: 312.596.5849
E: jpfieweger@michaelbest.com